**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| HAYDAR ALIREZA, an individual,<br><br>Plaintiff,<br><br>v.<br><br>ADAM KHAN and CARL SHURBOFF, individuals, and DOES 1 through 10, individuals,<br><br>Defendants. | Civil Action No. 1:26-cv-04048<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Haydar Alireza ("Plaintiff" or "Alireza") hereby brings this Complaint against Defendants Adam Khan ("Khan"), Carl Shurboff ("Shurboff"), and Does 1 through 10 (collectively, "Defendants") and alleges as follows:

**INTRODUCTION**

1. This action arises out of a series of repeated and persistent fraudulent misrepresentations that induced Plaintiff and his family and friends to invest approximately $9 million into Akhan Semiconductor, Inc. (the "Company" or "Akhan"). Defendants – Adam Khan, the Chief Executive Officer ("CEO") and Chairman of the Board, and Carl Shurboff, the President and Chief Operating Officer ("COO") – knowing made a series of false and misleading statements about the Company's financial condition, material contracts, and even presented a misleading valuation report all in a singular effort to use the investment proceeds to line their own pockets. Had Plaintiff and his friends and family known the truth, they never would have invested.

2. Defendants misrepresented the financial condition of Akhan, including their own salaries. In written investment materials, Khan and Shurboff affirmatively represented that their

annual compensation was $120,000 and $100,000, respectively. However, in two separate lawsuits and in their own respective depositions, Khan and Shurboff have asserted that their annual compensation was more than double that amount. In fact, Shurboff has testified that his annual compensation was four times that amount. To compound the issue, Akhan was purportedly deferring significant amounts of Khan's and Shurboff's compensation along with other employees because the Company was unable to meet its payroll obligations but did not even record or accrue any of the deferred compensation on its financial records. None of the Company's financial statements, including those provided to Alireza before his investments, reflected the actual employee compensation or the unpaid wages (also exposing the Company to employment law claims), which amounted to approximately $3.2 million by the time Alireza invested. Unfortunately, these misrepresentations were only the proverbial tip of the iceberg.

3. Khan and Shurboff also misrepresented the status of the Company's primary product, claiming that it had passed the proof of concept and testing phases and was ready for full production once sufficient funding was raised for a production facility. To support these statements, Defendants represented that a Tier-1 Original Equipment Manufacturer ("OEM") had issued a purchase order with a minimum purchase 50 million units and had agreed to a license fee. Defendants used these statements to validate their technology and reinforce their story that the Company was ready for mass production. Defendants also represented that the Company's intellectual property – the Company's critical asset – was unencumbered. Defendants made these statements to induce Alireza and his friends and family to invest. But none of Khan and Shurboff's statements were true.

4. On top of all these misrepresentations, Khan and Shurboff stated that a third party independent financial advisor, J.D. Merit, had valued the Company at more than $500 million.

These statements were misleading. J.D. Merit made a presentation and issued a written valuation report, determining that the Company had a valuation of more than $500 million. But Khan and Shurboff had misled J.D. Merit, just as they had misled Alireza and others. The Company's financial statements omitted the inability to meet payroll and the growing liabilities for the deferred compensation. Khan and Shurboff repeated the same fabrication that Akhan had received a purchase order with a minimum purchase of 50 million units, and the licensing arrangement were critical bases for that valuation.

5. After Khan and Shurboff secured millions in investments from Alireza and his friends and family, they showed their true intentions. Khan and Shurboff made their bid for "deferred compensation," then later performance "bonuses," essentially seeking to pay themselves all of the money they had just induced Alireza and his family and friends to invest in the Company.

6. Had Khan and Shurboff been truthful and honest in their dealings with Alireza, Alireza and his friends and family would have never invested. But now the Company is defunct. Alireza comes to this Court to seek its intervention to hold Khan and Shurboff accountable for their intentional misconduct.

**THE PARTIES**

7. Plaintiff Haydar Alireza is an individual residing in Saudi Arabia.

8. Upon information and belief, Defendant Adam Khan is an individual, who resided in the State of Illinois at all times relevant to the underlying allegations set forth herein, and currently resides in Tiburon, California.

9. Upon information and belief, Defendant Carl Shurboff is an individual residing at Antioch, Illinois.

10. Plaintiff does not know the true names and capacities of the Defendants sued in this action by the fictitious names DOES 1 through 10, inclusive. Upon information and belief,

Plaintiff alleges that each of the fictitiously named Defendants was in some manner responsible for, participated in or contributed to the matters and things of which Plaintiff complains herein, and in some fashion, has legal responsibility therefor, but Plaintiff is unable to determine each of the fictitiously named Defendants' true names without further discovery. When the exact nature and identity of the fictitious Defendants who are responsible for participating and contributing to the matters and things herein alleged are ascertained by Plaintiff, Plaintiff will amend this pleading to set forth the same.

11. Upon information and belief, Plaintiff alleges that each Defendant, including DOES 1 through 10, was and is the agent, employee, servant, subsidiary, partner, member, associate, or representative of each other Defendant, including DOES 1 through 10, and all of the acts and omissions alleged to have been done by the Defendants were done in the course and scope of the agency, employment, service, subsidiary relationship, partnership, membership, association, or representative relationship and with knowledge and consent of their respective principals, employers, masters, parent corporations, partners, members, associates, or representatives.

## JURISDICTION AND VENUE

12. This Court has personal jurisdiction over Defendants under the United States Constitution and the Illinois long-arm statute, including but not limited to 735 ILCS 5/2-209(a)(1), (2), (11), and (12), as well as under 735 ILCS 5/2-209(c). Specifically, under the United States Constitution and 735 ILCS 5/2-209(a)(12) and, this Court has personal jurisdiction over Defendants because the causes of action stated herein arise from their activities occurring within the State of Illinois and directed to the State of Illinois, including, but not limited in soliciting investment for Akhan, a corporation having its principal place of business in Illinois. Defendants also have availed themselves of courts within the State of Illinois by filing their own lawsuits against the Company here for employment-related claims, as detailed herein.

13. The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a) because the citizenship of each of the Defendants is diverse from the citizenship of the Plaintiff, and the amount in controversy exceeds $75,000.

14. Venue is proper under 28 U.S.C. § 1391(b) because this district is where Defendant Shurboff resides, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred, including where the misrepresentations were made and the investments occurred.

## FACTUAL ALLEGATIONS

### A. Khan And Shurboff Begin Deferring Compensation, But Never Record It On The Company's Records And Never Inform Prospective Investors

15. Khan earned an engineering degree, including studying at the University of Illinois. Khan subsequently researched diamond semiconductor technology and its potential applications to the electronics industry, leading to the formation of Akhan (the "Company") in 2012. Akhan, originally founded as an Illinois corporation, focused on the development and marketing of the Miraj Diamond technology, a synthetic diamond coating with potential applications in display glass for touchscreen screens for smartphones, tablets, and similar electronic devices, semiconductors, and optics.

16. Beginning in 2012, Khan served as CEO and its Chairman of the Board of Directors. In 2015, Khan claimed that he was due annual compensation of at least $200,000. Elsewhere, he has claimed that he was due $400,000 or more in annual compensation.

17. Khan has filed a lawsuit claiming unpaid compensation in an action entitled: *Khan v. Lacey, et al.*, Case No. 2025LA00000929 (Ill. Cir. Ct. filed Oct. 21, 2025) (the "Khan Lawsuit").[1] In that action, Khan has alleged that his full annual compensation was not paid, and

---

[1] Alireza is not a party to that lawsuit.

instead a portion was deferred. Specifically, Khan alleges: "On or about August 1, 2015, Defendant, AKHAN, agreed to pay Plaintiff, ADAM KHAN, his deferred backpay when adequate funds were available through future investment fund-raising."

18. Shurboff joined Akhan initially as its COO in approximately April 2015, following approximately two decades of semiconductor and technology experience. In a letter dated April 16, 2015, Shurboff was offered a "[b]ase annual salary of $400,000.00 at full time employment." Shurboff has testified that he accepted that offer.

19. Following Shurboff's termination from the Company in 2023, Shurboff commenced an arbitration against the Company claiming unpaid compensation dating back to 2015, in a proceeding entitled: *Shurboff v. Akhan Semiconductor, Inc.*, JAMS No. 5340000821 (the "Shurboff Arbitration").

20. Subsequently, Shurboff filed suit in 2024 against certain former officers of the Company and he again alleged unpaid compensation dating back to 2015, in the action entitled: *Shurboff v. Lacey, et al.*, Case No. 2024 CH 00000081 (Ill. Cir. Ct. Compl. filed May 24, 2024) (the "Shurboff Lawsuit").[2]

21. Similar to Khan, during a deposition, Shurboff testified that, beginning in 2015, portions of his annual compensation were not paid, but deferred. For example, Shurboff testified: "So in August of 2015 is when I started to realize that Akhan's cash flow was not as high as I understood it to be … So we agreed to defer income, still had wages earned the same, and then wages paid would be dependent upon the amount of money that the company had, and the rest would be wages deferred."

[2] Alireza is not a defendant in that lawsuit, but he is involved as a third-party defendant based upon certain claims of the defendants.

22. The Company's inability to meet payroll was the impetus for deferring compensation. It extended beyond just Khan and Shurboff; other employees and independent consultants regularly had their agreed compensation not timely paid and deferred. This deferred compensation, as Shurboff testified during his deposition, "was not an official plan."

23. The deferred compensation was not recorded on the Company's accounting system or reflected in the Company's financial statements. Indeed, Khan and Shurboff were aware of this glaring deficiency on the Company's financials. For example, in an e-mail dated June 21, 2018, Dan Gravelle, the Company's then CFO, wrote to Shurboff: "You say you are paying 50% to yourself and [Khan], are we accruing the difference, or is it your intent to bring yourself to full pay, with the closing of Series A?" Shurboff responded that same day, copying Khan, stating: "We are accruing the difference, and intending upon requesting the board for a bonus to make up for the shortfall. Technically, I haven't been paid regularly since 2016." However. despite stating that the deferred compensation was "accruing," it was still nowhere on the Company's records. In fact, Khan was aware of this deficiency and testified that he raised the issue with Shurboff in 2019 or 2020. Khan also testified that Shurboff and the Company's outside accountant, Craig Shaffer, were "working on" cleaning up the books. But it never happened.

24. In fact, from 2019 through 2020, Khan and Shurboff signed numerous documents, including tax returns, requests for government loans, and banking materials, that did not list any deferred or accruing compensation due to them or anyone else, even though Khan and Shurboff have each testified that a portion of their own salaries was being deferred since 2015.

25. The deferred compensation never appeared in the Company's financial statements provided to investors, such as Alireza.

26. As the years went by and the Company slowly grew, Khan and Shurboff solicited and continued to take on investments from prospective investors. However, the deferred compensation never appeared in the Company's financial statements provided to investors, such as Alireza.

**B. Alireza Is Introduced To Defendants**

27. In approximately 2015, Alireza was introduced to Akhan through a business acquaintance. As Alireza became interested in learning more about Akhan, he received a written business plan used to solicit investments. In a section entitled Personnel Plan, the Business Plan listed Khan's annual compensation at $120,000 in Years 1 and 2, and Shurboff's at $100,000 in those years. (*Id.* at 21.) The Business Plan made no mention of any performance bonus. It made no mention of any persistent inability to make payroll. The plan also made no mention of any deferred compensation for Khan, Shurboff, or any other Company employee or contractor, even though both Khan and Shurboff have testified that the Company began deferring their compensation by August 2015.

28. The Business Plan was not an isolated document. In approximately 2016, Khan and Shurboff prepared a private placement memorandum (the "PPM") for prospective investors. That PPM also listed the same $120,000 and $100,000 salaries for Khan and Shurboff respectively, again with no mention of any performance bonus, of any difficulty in meeting payroll, or any liability for deferred compensation. Instead, the PPM stated: "there was "no accrued compensation that is due to any member of Management."

29. After receiving the Business Plan and preliminary calls about the Company, Alireza met with Khan and Shurboff in Bahrain on or about November 10, 2015. The meeting lasted several hours. Alireza asked about various aspects of the Business Plan to gain a deeper

understating of the Company's technology, its prospects, and Khan and Shurboff's management of the Company. Alireza asked Khan and Shurboff about the Company's capitalization, debt structure, and expense projections for the company's growth. However, Khan and Shurboff did not attempt to correct the inaccurate and misleading information in the Business Plan. Neither stated that their actual annual compensation was more than $120,000 and $100,000 respectively as set forth in the Business Plan, let alone that it was at least more than double. Instead, Khan and Shurboff touted that their compensation and for other members of management were reasonable and modest for a start-up, and they did not expect any significant changes in their compensation until the Company became profitable. To an investor, this representation is critical to understanding that invested funds are not going to fund higher executive salaries, but instead that a company will use invested funds to grow, and in the case of Akhan at the time, to focus on developing a product to bring to market.

30. During that meeting in Bahrain, neither Khan nor Shurboff informed Alireza that the Company was unable to meet its payroll obligations regularly. In fact, Alireza asked Khan and Shurboff about the Company's capital needs and its ability to meet its general obligations; Khan and Shurboff failed to disclose the inability to meet payroll that they have now testified was directly impacting their own salaries. Neither informed Alireza that there was a growing amount of deferred compensation for them (and other employees) and that such a liability was not reflected in the Company's financial records. Upon information and belief, the reason for Khan and Shurboff's silence is readily apparent — if they had been truthful, they feared that Alireza would pass on the Company.

31. Because Alireza was not told the truth, Alireza was impressed with Khan and Shurboff, and he was interested in following the Company and seeing its progress. After that Bahrain meeting, Alireza continued in periodic conversations with Khan and Shurboff.

**C. Alireza Provides a $300,000 Convertible Loan**

32. In early 2019, Khan and Shurboff pursued Alireza to make a convertible loan to the Company. Between February and March 2019, Alireza had multiple telephone conversations with Khan and Shurboff to understand the Company's current prospects and financial condition since the Bahrain presentation.

33. As part of Alireza's diligence for a convertible loan, he sent an e-mail on March 11, 2019, asking, among other things, about the Company's monthly burn rate, *i.e.*, the monthly operating expenses. Shurboff responded on March 11, 2019, copying Khan, stating that the Company's burn rate had increased from $57,000 to $70,000 per month. That would peg annual operating expenses at $840,000 a year. Shurboff has testified that at the that time, he was the Company's COO and President, and he oversaw payment of Company's expenses.

34. Shurboff's statement of the burn rate, however, was misleading, if not outright false. If Khan and Shurboff each had annual compensation of $400,000, the monthly burn rate attributable to their compensation alone would be approximately $67,000 per month leaving no room for any other Company employee or other normal operating expenses (*e.g.*, rent, utilities, or even materials development of the Company's product). Shurboff also did not explain that the Company was unable to meet its current obligations, particularly for payroll, and that it was instead deferring compensation and allowing that liability to grow (while not recording it on the Company's financial records). Khan made no effort to clarify or correct the misleading nature of

the e-mail. Instead, the burn rate advanced the (false) impression that the Company was leanly managed, focused on developing the Company's products.

35. In fact, at his deposition, Khan was asked about this burn rate e-mail and his compensation at the time: "Q: And, at this point, you didn't say, well, Mr. Alireza, I just want you to know that Mr. Shurboff and I are taking only a portion of our salary and we intend to be made whole through the Series A financing, did you? A: I don't believe so."

36. At his deposition, when handed the Company's balance sheets from 2017 through 2019, Khan admitted that "I do not see [the deferred compensation] here."

37. Without true and honest information, Alireza made a $300,000 convertible loan to the Company.

**D. Khan and Shurboff Pursue Alireza and his Friends and Family for Investments**

38. Following the convertible note, Khan and Shurboff (Khan in particular) engaged in more routine communications with Alireza.

39. By 2020, Khan and Shurboff devised and launched a more formal investment plan for the Company, in which they would offer "Series A" preferred stock to investors. By the fall of 2020, Khan and Shurboff were in regular communications with Alireza seeking his personal investment into the Company. They also inquired if any of Alireza's family members or business associates could be contacted regarding or were interested in potential investments as well. Based upon the trust that Khan and Shurboff had already built with Alireza, Alireza told them that he would inquire and could likely facilitate additional investments.

40. Over the coming months, Khan and Shurboff further groomed their presentation about the Company's prospects to lure Alireza and his friends and family into significant investments.

41. For example, in a series of telephone calls between Khan and Alireza in September and October 2020, Khan touted the Company's performance in passing testing standards of a Tier-1 OEM. Khan referred to that company by the code name "Red," because he explained to Alireza that the Company was under a non-disclosure agreement to keep the OEM's name confidential. While feigning an effort to maintain confidentiality, but to pique Alireza's interest, Khan stated that the OEM was one of the largest manufacturers of smartphones and tablets worldwide, and was based in California. Khan repeatedly told Alireza that the Company had passed the testing results, and that he was negotiating a purchase order with Red for a minimum purchase guarantee of 50 million units. Based upon the expected pricing that Khan mentioned, that production guarantee would amount to between $250–500 million in revenues.

42. During those calls, Alireza asked about the Company's intellectual property, which was the backbone to the Company's success. Khan repeatedly reassured Alireza that the Company owned all of the intellectual property and that there were no encumbrances or other limitations.

43. While Khan was actively, though deceptively, forecasting the Company's revenues from the deal he was supposedly negotiating with Red, Alireza asked Khan about the Company's expenses, liabilities, and budgets in September and October 2020. Khan did not disclose any higher compensation levels for Shurboff or himself, the continued inability to meet regular payroll, or the growing mountain of deferred compensation due to Shurboff and him (and other Company employees). Nor did Khan disclose the risks associated with the failure to make payroll, including for possible lawsuits from unpaid or underpaid employees or potential for employee departures.

44. Based upon Khan and Shurboff's representations and their failure to disclose the true condition of the Company, Alirez made an investment of $200,000 in October 2020. One of his family members also invested $100,000.

45. Over the next couple months, Khan and Shurboff aggressively solicited additional investments from Alireza and his friends and family. In turn, Alireza was regularly asking for updates regarding Khan and Shurboff's negotiation of the contracts with Red.

46. In December 2020, over a series of telephone conversations and e-mails, Shurboff and Khan represented to Alireza that they had secured agreements with Red. For example, an e-mail dated December 15, 2020, Shurboff told Alireza that: "We received the [Red] agreement." Shortly thereafter, Khan touted the Red purchase order in a call with Alireza. Khan also informed Alireza that Red agreed to a licensing fee.

47. On December 28, 2020, Shurboff sent an e-mail to Alireza with an attachment, stating: "Here is the format for the 1-pager, with Series A information. We will us[e] this to discuss the content needed for your discussion." The attachment reads:

> Since its debut in 2017, all the world's top OEMs have engaged with AKHAN on its Miraj Diamond® Glass technology. Now, ***one has been selected*** as its exclusive launch partner. ***With a large upfront license fee and contract for >100MM per year production capacity***, AKHAN's Miraj Diamond® Glass is ready for High-Volume Production Expansion.

(emphasis added.) The "one" referred to Red, consistent with Khan and Shurboff's regular conversations and conference calls with Alireza at the time.

48. As Alireza was considering his next investment, on December 28, 2020, Shurboff sent Alireza an e-mail with financial projections. Alireza responded on December 29 stating: "***I don't think the financial highlights are correct. Its showing Revenue of $ 960K in 2021 and 19.7M in 2022. I thought it would be nearer to $500M-$1B depending on whether [] you produced 50 Million units versus 100m units. Can you please explain***." Shurboff responded that same day: "***Correct. The financial haven't been adjusted for the [Red] volumes. These are placeholders from the original file. We will change these once the financials are complete***."

49. Based upon these additional representations, Alireza invested $650,000 in December 2020. Alireza's mother and another family member also each invested $250,000,

50. To further attract Alireza's investment (and others), Shurboff and Khan informed Alireza that they had engaged an independent financial advisor, J.D. Merit, to value the Company. On or about January 29, 2021, Alireza attended a Zoom meeting with Khan, Shurboff, and others. During the meeting, David Wanetick, the CEO of J.D. Merit, made a presentation and stated that as the result of the financial analysis, J.D. Merit valued the Company at $500 million. That valuation was misleading. Khan and Shurboff's repeated the same misrepresentation to J.D. Merit, *i.e.*, that they had secured the Red purchase order for a minimum purchase guarantee of 50 million units and the upfront licensing fee. Khan and Shurboff also informed J.D. Merit that the Company's intellectual property was unencumbered. Khan and Shurboff also had provided false information that the Company was working with Red to develop a plan for mass production, but there was no such plan and the Company's products were not ready for mass production.

51. Accordingly, Alireza made another $300,000 investment, effective, on or about January 31, 2021. More specifically, Alireza's promissory note from 2019 was maturing, but based upon Khan and Shurboff's misrepresentations and misleading information, he converted the promissory note into additional equity of the Company.

52. Alireza joined the Company's Board of Directors on or about February 11, 2021, but Khan and Shurboff kept up the façade. When Alireza and others, including other Board members, asked to see the contract with Red, Khan and Shurboff claimed that Red's strict non-disclosure agreement precluded them from sharing the actual contract. At the time, Alireza and others found the explanation to be reasonable and consistent with their understanding of due incredible levels of commercial secrecy under which a Tier-1 OEM, such as Red, typically operates

to maintain its competitive advantage. Importantly, Alireza had no reason not to believe Khan and Shurboff.

53. The representation also was consistent with Khan and Shurboff's prior statements about the Company's progress in developing its product. The representation validated the Company's technology and the Company's pursuit of a manufacturing facility as the Company's next milestone. In fact, Khan and Shurboff convinced Alireza to begin using his own contacts within the Middle East, including with sovereign wealth funds, to assist the Company's efforts to identify and build a suitable manufacturing facility and attract additional capital. As part of this, the Company engaged Porsche Engineering to develop plans for a manufacturing facility. With those plans, Alireza was actively involved in arranging and participating in meetings for possible locations for the manufacturing site in Saudi Arabia, the UAE, and Bahrain.

54. Over the next several months, Khan and Shurboff repeated these same misrepresentations to additional prospective investors who Alireza introduced to the Company. By this point, the Company was continuing its Series A round and planning on a larger $300 million investment specifically to fund the manufacturing facility. Alireza was instrumental in identifying and making an introduction to Mubadala as a possible investor in this larger round. On or about February 17, 2021, Khan made a Zoom presentation to Badr Al-Olama from Mubadala. As part of the presentation, Khan provided a slide deck representing that the Company had the signed contract with Red for 50 million units. Khan further represented the intended use of proceeds from upcoming investment rounds; nowhere did he disclose any use for deferred compensation or bonus to Shurboff or himself. By e-mail dated March 1, 2021, to Al-Olama, Shurboff repeated the same refrain that the Company Diamond Glass was ready for mass production and that it had the purchase order with Red.

55. In e-mail dated February 23, 2021, Al-Olama sent a detailed list of due diligence questions. Mubadala also engaged an entity named Strata to perform the diligence. In an e-mail dated April 15, 2021, Shurboff responded to various diligence questions, including that we specifically asked about the Company's intellectual property, he responded: "No. AKHAN's patents are unencumbered."

56. Between March and May 2021, Alireza's friends and family invested over $1.9 million during that period.

**E. Khan and Shurboff Seek to Use the Investments to Pay Themselves**

57. After securing millions from Alireza, and his friends and family, Khan and Shurboff attempted to carry out their scheme to effectively siphon all of the Company's invested funds to themselves. As has come to light in the Shurboff lawsuit, Khan and Shurboff secretly created and signed a memorandum entitling them to $3,261,312 in "deferred compensation." After they presented that memorandum to the Company's then-CFO Amy Schoeder, Khan and Shurboff instead claimed that the same amount was not "deferred compensation," but instead a bonus in the exact same amount, in another memorandum that Khan and Shurboff secretly created and signed.

58. On or about June 2, 2021, Shurboff purported to authorize a wire payment to Khan in the amount of $1.3 million as payment of the bonus. The wire did not go through, but the Board of Directors, including Alireza, was alerted to the attempted wire.

59. After the failed wire, Alireza spoke with Khan by telephone. Khan stated that he authorized the bonus because he was in need of funds to complete the purchase of a house for his family, including for his pregnant wife. Alireza responded that according to Khan, the Company was on the verge of taking off due to the agreements with Red, and as a founder, his shares would become highly valuable and he would have no trouble buying a house. However, Khan protested;

he could not wait and that he had been counting on receiving the "bonus" in order to close on the house. Following those conversations, Alireza agreed to and paid $1.3 million to Khan in exchange for Company shares from Khan.

60. By July 2021, Shurboff was still asking for payment of "deferred compensation" and/or a "bonus." Alireza informed the Board of Directors that Shurboff's claim, to the extent it was for "deferred compensation," was contrary to his statements from March 2019 about the Company's burn-rate. Tom Lacey, a new member of the Company's Board of Directors, directly discussed these issues with Shurboff. In reporting to the Board on his conversation with Shurboff, Lacey stated in an e-mail dated July 7, 2021: "The back pay is totally off the table. [Shurboff] doesn't want to pursue it."

61. Soon after, Shurboff entered into a General Release Agreement with the Company as part of a new employment agreement. In the General Release Agreement, Shurboff released all claims under Illinois and federal wage laws for, among other things, "unpaid wages" and "any other claims for compensation." He also expressly represented that "[Shurboff] has been paid all wages, compensation, benefits . . . that [the Company] or any other Released Party ever owed [Shurboff]." That agreement also contained a covenant not to sue over any released claim. Alireza and other members of the Board received a copy of the General Release Agreement.

62. After the General Release Agreement and Alireza purchase of Company stock from Khan, Khan and Shurboff no longer claimed that they were due any outstanding "deferred compensation," "bonus," or any other form of compensation. Instead, they resumed work as before on the Company's products while additional Series A fundraising and larger fundraising efforts for a suitable production facility occurred.

63. Based upon that covenant not to sue, express representation that Shurboff had been paid all compensation, and the continued belief in the existence of the Red contracts and J.D. Merit valuation, Alireza subsequently invested approximately $900,000 and his friends and family invested another $2.6 million.

64. Throughout the remainder of 2021, Khan repeated the same statements about the Red contract and the J.D. Merit valuation. For example, Khan met with John Thode in approximately December 2021 about a prospective management position with the Company, and Khan repeated the same representations about the Red purchase order and J.D. Merit valuation.

65. The truth began to come to light when Thode joined the Company as the COO and Craig Mitchell as the new CEO. The Company merely had an agreement with Red that allowed it to evaluate the Company's technology. But Red had not entered into any definitive purchase order, and there was a licensing agreement that encumbered the technology in two ways – first that Red was the exclusive licensee for the first generation of the Company's products and essentially a right of first refusal for new generations of the Company's products, and second a co-development provision that could make Red the co-owner of the intellectual property. The J.D. Merit valuation, premised upon that Red purchase order, among other things, was not worth the paper it was written on.

**F. Alireza Acquires Claims of the Company Regarding Advances to Khan**

66. During the course of Khan's employment, the Company made advances to Khan in the amount of $327,461.62 against his compensation. Khan has acknowledged receipt of those advances on multiple occasions, including to the Company's outside auditors. Khan has even testified to receiving advances at his deposition.

67. On August 16, 2024, Alireza entered into an Executive Advance Assignment and Assumption Agreement with the Company, under which he acquired the Company's rights to the debt Khan owed the Company for those prior advances.

68. Khan has never made a payment, and $327,461.62 remains outstanding.

**G. Alireza Receives Assignments from his Friends and Family**

69. There had been a glimmer of hope because new management worked tirelessly to salvage the technology and found a new application that was promising to Red, and Alireza and others secured a possible lifeline for a new lead investor. But Shurboff extinguished that final glimmer when he made a demand and soon after filed his arbitration. The prospective investor, unsurprisingly, passed.

70. The Company is now defunct. Alireza and his friends and family have lost approximately $9 million, all based upon the fraud Khan and Shurboff perpetrated. That fraud also caused reputational damage to Alireza among his colleagues and family, and he personally lost countless hours and opportunities by trying to secure additional investments, including for a production facility.

71. Khan and Shurboff have filed their own actions seeking the supposed "deferred compensation," which has dragged Alireza into costly litigation. Alireza would have never invested and never been involved with the Company had Khan and Shurboff told the truth – at any of the many opportunities to come clean.

72. In October 2025, Alireza's friends and family who invested in the Company assigned all of their rights to those investments, including any claims and chose in action, to Alireza.

## COUNT I

### Fraudulent Inducement
### (Brought by Plaintiff against All Defendants)

73. Plaintiff hereby incorporates the allegations contained in paragraphs 1 through 72 as if fully restated and re-alleged herein.

74. Defendants committed multiple acts of misrepresentation and omission by which they intended to induce Plaintiff, and his friends and family, into investing in the Company and then later claim such invested funds were owed to them in the form of either deferred compensation or a bonus.

75. Defendants' false and misleading statements related to material facts, and include but are not limited to:

a. That Khan and Shurboff's annual compensation was $120,000 and $100,000, respectively, when Khan and Shurboff claim that they each were owed total annual compensation of $400,000 or more at that time;

b. That Khan and Shurboff failed to disclose that the Company was unable to meet its normal payroll obligations for Khan, Shurboff, and other employees or independent contractors;

c. That Khan and Shurboff failed to disclose that as much as half of their annual compensation was deferred due to the Company's inability to meet payroll, and that they expected to receive payment for any deferred compensation or a bonus in an amount equal to the deferred compensation from investment proceeds;

d. That Khan and Shurboff failed to disclose that the Company's financial statements and other records provided to Alireza did not account for the growing deferred compensation or debt liability;

e. That Khan and Shurboff stated that Red issued a written purchase order with a minimum guaranteed purchase of 50 million units, which would have created revenues between $250–500 million;

f. That Khan and Shurboff stated that the Company's product had passed testing with Red and was ready for mass production upon securing a production facility;

g. That Khan and Shurboff stated that they had secured an upfront licensing fee from Red;

h. That Khan and Shurboff stated that the Company's intellectual property was unencumbered;

i. That Khan and Shurboff failed to disclose that the J.D. Merit valuation was incomplete and based upon false information regarding the Red purchase order and readiness of the Company's products for mass production; and

j. Once confronted with his prior representations regarding his salary, Shurboff's express representation in the General Release Agreement that he is not owed any outstanding compensation from the Company and other covenants within that agreement.

76. Defendants made these representations with the knowledge or belief that such statements were false and intentionally misleading.

77. Such representations were made for the purpose of inducing Plaintiff and his friends and family to invest in the Company.

78. Plaintiff and his friends and family reasonably relied on Defendants' representations in deciding to invest in the Company.

79. Such reliance was justifiable because Plaintiff obtained investor materials, business plans, and direct assurances from Defendants through the due diligence process that the representations were true and could be relied upon, and Defendants knew that Plaintiff was relaying that information to his friends and family.

80. Defendants' misrepresentations and omissions proximately caused Plaintiff and his friends and family to suffer substantial monetary damages and economic injuries that continue to accrue.

81. Defendants' misrepresentations and omissions proximately caused Plaintiff to suffer consequential damages.

82. Defendants acted with malice or reckless indifference to the likelihood their conduct would harm Plaintiff financially. In addition to actual and consequential damages, punitive damages are necessary to punish Defendants and deter others from similar misconduct.

**COUNT II**

**Negligent Misrepresentation**
**(Brought by Plaintiff against All Defendants)**

83. Plaintiff hereby incorporates the allegations contained in paragraphs 1 through 72 as if fully restated and re-alleged herein.

84. Defendants made several false statements of material fact by which they deceived Plaintiff in order to secure his investments in the Company which include but are not limited to:

a. That Khan and Shurboff's annual compensation was $120,000 and $100,000 respectively, when Khan and Shurboff claim that their total annual compensation was $400,000 or more at that time;

b. That Khan and Shurboff failed to disclose that the Company was unable to meet its normal payroll obligations for Khan, Shurboff, and other employees or independent contractors;

c. That Khan and Shurboff failed to disclose that as much as half of their annual compensation was deferred due to the Company's inability to meet payroll, and that they expected to receive payment for any deferred compensation or a bonus in an amount equal to the deferred compensation from investment proceeds;

d. That Khan and Shurboff failed to disclose that the Company's financial statements and other records provided to Alireza did not account for the growing deferred compensation or debt liability;

e. That Khan and Shurboff stated that Red issued a written purchase order with a minimum guaranteed purchase of 50 million units, which would have created revenues between $250–500 million;

f. That Khan and Shurboff stated that the Company's product had passed testing with Red and was ready for mass production upon securing a production facility;

g. That Khan and Shurboff stated that they had secured an upfront licensing fee from Red;

h. That Khan and Shurboff stated that the Company's intellectual property was unencumbered;

i. That Khan and Shurboff failed to disclose that the J.D. Merit valuation was incomplete and based upon the false information for the Red purchase order and readiness of the Company's products for mass production; and

j. Once confronted with his prior representations regarding his salary, Shurboff's express representation in the General Release Agreement that he is not owed any outstanding compensation from the Company and other covenants within that agreement.

85. Defendants failed to exercise reasonable care or competence in providing the above false, material facts to Plaintiff and knew that Plaintiff was relaying the information to his friends and family.

86. Plaintiff and his friends and family would not have invested had they known the truth that Defendants misrepresented.

87. Plaintiff and his friends and family justifiably relied on the acts of Defendants to their detriment.

88. Defendants' misrepresentations proximately caused Plaintiff and his friends and family to suffer substantial monetary damages and economic injuries that continue to accrue.

89. Defendants' misrepresentations proximately caused Plaintiff to suffer consequential damages.

**COUNT III**

**Breach Of Contract**
**(Brought by Plaintiff against Defendant Khan)**

90. Plaintiff hereby incorporates the allegations contained in paragraphs 1 through 72 as if fully restated and re-alleged herein.

91. Khan received advances from the Company against his compensation totaling $327,461.62 during his tenure at the Company, and in so doing, Khan entered into an implied-in-fact contract with the Company to repay those advances upon demand. Khan remains indebted to the Company in that amount.

92. Alireza is the assignee of that debt.

93. Alireza and the Company before him have substantially performed all of the obligations owed to Khan, except for those that they are excused from performing.

94. Khan has breached the implied-in-fact contract by failing to repay the amount of $327,461.62.

95. This breach has caused Alireza to suffer substantial damages in an amount to be proven at trial, but in an amount no less than $327,461.62.

## COUNT IV

### Unjust Enrichment
### (Brought by Plaintiff against Defendant Khan)

96. Plaintiff hereby incorporates the allegations contained in paragraphs 1 through 72 as if fully restated and re-alleged herein.

97. Khan has benefitted from, among other things, the advances that he received from the Company in the amount of $327,461.62.

98. Alireza is the assignee of that debt.

99. Khan has not paid Alireza (or the Company before him) for the benefits he has received.

100. As a direct and proximate result of Khan's wrongful conduct, Khan has been unjustly enriched to the detriment of Alireza.

101. It would be unjust, unfair, and inequitable to permit Khan to retain these benefits.

102. Alireza demands restitution in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Haydar Alireza prays for judgment and relief as follows against Defendants Adam Khan and Carl Shurboff:

A. For compensatory damages according to proof;

B. For consequential damages according to proof;

C. For punitive and exemplary damages as permitted by law;

D. For restitution and/or disgorgement according to proof;

E. For interest as provided by law;

F. For such further or other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all counts so triable.

Dated: April 10, 2026

Respectfully Submitted:

By: */s/ Joseph F. Marinelli*

Joseph F. Marinelli (ARDC No.: 6270210)
Katherine M. Schelli (ARDC No.: 6342582)
**IRWIN IP LLP**
150 N. Wacker Drive Suite 700
Chicago, IL 60606
Tel: 312-248-1584
jmarinelli@irwinip.com
kschelli@irwinip.com

Marc J. Schneider (*PHV* forthcoming)
Stephen L. Ram (*PHV* forthcoming)
Morgan Williams (*PHV* forthcoming)
**STRADLING YOCCA CARLSON & RAUTH LLP**
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660-6422
Tel: 949.725.4000
Fax: 949.725.4100
mschneider@stradlinglaw.com
sram@stradlinglaw.com
mwilliams@stradlinglaw.com

*Attorneys for Plaintiff Haydar Alireza*